UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

455 COMPANIES, LLC,

    Plaintiff,

v.                                                    Case No. 16-10034

LANDMARK AMERICAN INS. CO.,

    Defendants.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Insured Plaintiff 455 Companies, LLC alleges that Defendant Landmark American Insurance Company breached their property insurance contract by wrongly denying their claim resulting from water damage to the insured property. The dispute was reassigned to this court on May 17, 2017—shortly before its scheduled jury trial date of July 10, 2017. (Dkt. # 156.) The parties have engaged in extensive motion practice in anticipation of trial, and some sixteen motions remain pending. Each party has filed a motion for summary judgment concerning separate issues, as well as several motions to exclude testimony or other evidence that must be resolved with the summary judgment motions. The court will address each party's partial summary judgment motion and various motions to exclude in separate opinions.

Now before the court is Plaintiff's motion for partial summary judgment. (Dkt. # 62.) Plaintiff asks that the court find that the loss is covered under the policy as a matter

of law. (Dkt. # 62.) The motion is fully briefed, and a hearing is unnecessary. *See* E.D. Mich. LR 7.1(f)(2).[1] For the reasons that follow, the court will deny the motion.

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed. Plaintiff owns a 114,000 square foot commercial building with five floors, a basement, and two mechanical penthouses on the roof, all located at 455 West Fort Street in the downtown business district of Detroit, Michigan ("the Building"). At all times during Plaintiff's ownership, the Building has been vacant.

### A. The Policy

Plaintiff purchased an all-risk commercial property insurance policy ("the Policy") for the Building from Defendant. (Dkt. # 62-1.) The Policy provided coverage up to $15 million per occurrence on a replacement cost basis for a term to last from July 8, 2014, through July 8, 2015. Specifically, the policy provides coverage "for direct physical loss of or damage to Covered Property" subject to a $25,000.00 deductible. (*Id.* at Pg. ID 1325, 1302-04.)

The "causes of loss—special form[,]" referenced by the policy declarations excludes coverage for "loss or damage caused by or resulting from . . . .

> (g) Water . . . that leaks or flows from plumbing, heating, air conditioning or other equipment . . . caused by or resulting from freezing, unless
>> (1) You do your best to maintain heat in the building or structure; or
>> (2) You drain the equipment and shut off the supply if the heat is not maintained."

---

[1] Plaintiff has also filed an unopposed motion for leave to file an amended reply brief to its partial summary judgment motion (Dkt. # 155), explaining that it inadvertently omitted an exhibit in its original filing. The court GRANTS Plaintiff's unopposed motion (Dkt. # 155) pursuant to E.D. Mich. LR 15.1 and will refer to the original motion with the exception of the additional exhibit.

(Dkt. # 62-1, Pg. ID 1345.) The Policy also includes two relevant endorsements: one titled "Protective Safeguards" and the other "Protective Safeguards—Form Change." (*Id.* at Pg. ID 1322-24.) A line at the top of the first, the "Protective Safeguards" endorsement, provides, "THIS ENDORESEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." (*Id.* at 1322.) The form lists "protective safeguards" which are "added to" the "commercial property conditions." (*Id.*) The form provides, "As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above." (*Id.*) The schedule section of the form lists "Heat maintained at 55 degrees" as a "protective system[.]" (*Id.*)

The second endorsement—entitled "Protective Safeguards—Form Change" also provides, at the top of the page, "*This Endorsement Changes the Policy. Please Read It Carefully.*" (*Id.* at Pg. ID 1324.) The Form Change endorsement states that "Item B. on the Protective Safeguards is replaced by" its contents. (*Id.*) Specifically, the Form Change states that it adds the following provision to the "Exclusions section of . . . causes of loss – special form":

> We will not pay for loss or damage caused by or resulting from applicable causes of loss specified below, if prior to the loss, you:
> a) Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or
> b) Failed to maintain any protection safeguard listed in the schedule above, and over which you had control, in complete working order.

(*Id.*) The form then provides a range of "Applicable Cause[s] of Loss" with checkboxes, with the box indicating "Water Damage" checked. (*Id.*) Finally, the Form Change endorsement states "Water Damage applies to Warrant Heat maintained at 55 degrees." (*Id.*) The "causes of loss—special form" defines water damage as "accidental discharge or leakage of water or steam as the direct result of the breaking apart or

3

cracking of a plumbing, heating, air conditioning or other system or appliance . . . that is located on the described premises and contains water or steam." (Dkt. # 62-1, Pg. ID 1352.)

### B. The Loss

In early January of 2015, a pipe broke in the women's restroom on the fifth floor of the Building.[2] On January 13, the leak was discovered.[3] Michael J. Brugger, COMM's Director of Operations, was notified that the building was flooding and "ran over to the building" from his office one block away. (Dkt. # 62-15, Pg. ID 1475, 1480.) Brugger, with the assistance of another individual, traced the leak to the broken pipe in the fifth floor bathroom, and shut off the water. (*Id.* at Pg. ID 1475-79.) Brugger testified that the building was warm when he arrived. (*Id.* at Pg. ID 1481.) At some point after shutting off the water, Brugger checked the temperature and pressure of the baseboard heat recirculation system that heats the building. (*Id.* at Pg. ID 1489-90; 1499-1500.) Brugger also testified that the recirculation pumps were on at the time, (Dkt. # 62-15, Pg. ID 1484-85), the baseboard was warm to the touch, (*id.* at Pg. ID 1507), and the steam room was "hot like a sauna" (*id.* at Pg. ID 1493).

Brugger testified that he took photographs of the thermometer and pressure gauges of the baseboard recirculation water pumps at that time, which indicate a setting of approximately 160 degrees. (*Id.* at Pg. ID 1489, 1499-1501; *see also* Dkt. ## 62-16,

---

[2] Nothing in the record establishes more precisely when the pipe burst.
[3] Defendant "contends that the date of discovery has neither been established nor confirmed by any witness" and cites to deposition testimony of two individuals stating that they were not sure when the loss was discovered. (Dkt. # 82, Pg. ID 5109.) But Michael Brugger testified affirmatively that it was January 13th, and the basis for his belief is that "[he] was there." (Dkt. # 62-15, Pg. ID 1473.) Accordingly, the court finds that the date of discovery is not genuinely in dispute.

4

62-17, 62-18, 62-19.) The "metadata" proffered by Plaintiff in connection with the photographs indicates that they were taken on January 13, 2015 between 12:04 and 12:06 p.m. (Dkt. ## 16-20, 16-21, 16-22, 16-23, 16-24.) Defendant contends that the metadata is not admissible and is "subject to simple manipulation and fabrication by its operator[,]" objects that the phone itself was never produced and "is subject to a spoliation charge[,]" and that Brugger testified he could not recall exactly when he took the photographs. (Dkt. # 82, Pg. ID 5110.) Defendant has filed a motion *in limine* to exclude the photographs and attendant metadata under Federal Rule of Civil Procedure 37(e). (Dkt. # 123.)

Matthew Pollard, the building's former facility manager, testified that, in his experience, maintaining a reading of 160 degrees on the loop temperature kept the building between 55 and 60 degrees. (Dkt. # 62-13, Pg. ID 1455, 1458.) Defendant argues that Pollard's testimony assumes the system is fully operational and all zones of the system are in proper working order. (Dkt. # 82, Pg. ID 5111.) Thus, if the system is not fully operational, some portions of the building will not be heated regardless of the loop temperature's reading.

Defendant contends that "[b]y all accounts, ice lined the interior windows of the subject [c]ommercial building with varying thickness from half an inch to an inch thick on the loss discovery date." (Dkt. # 82, Pg. ID 5123.) In support, Defendant points to deposition testimony of an Isaac Sheppard, Jr. stating that "there was a half inch to an inch of ice on the window" and clarified that it appeared to be on the interior, not the exterior, of the window. (Dkt. # 84-13.) But nothing in the three-page excerpt of Mr. Sheppard's deposition testimony indicates when he was on the premises. (*See id.*)

5

Signal Restoration Services ("Signal") was called to begin repair work, and Signal retained Solomon Plumbing to fix the broken fifth floor pipe. (Dkt. # 114-4, Pg. ID 7662-63.) Solomon Plumbing employee Jim Wagner testified that, when he arrived on January 13, the building felt "really cold" (Dkt. # 84-14, Pg. ID 5368) and there was ice built up on the inside of the windows (Dkt.# 133-2, Pg. ID 9518). Solomon's repair invoice for January 13 indicates the work performed was "repaired frozen 1 1/2[ inch] water main on 5th floor." (Dkt. # 84-15.)[4]

On or about January 16, 2015, Pollard discovered an additional water leak in the penthouse. (Dkt. # 1-1, Pg. ID 13; Dkt. # 84-9, Pg. ID 5327-29.) Pollard explained that when he discovered the penthouse leak, "there was water dripping out of a frozen pipe" which had made its way from the penthouse down to the first floor. (Dkt. # 84-9, Pg. ID 5329.)

Defendant proffers two expert witnesses to testify that the fifth floor pipe burst due to either that section of the pipe freezing or from a pressure buildup caused by the frozen penthouse pipe. Both witnesses are subject to a motion to exclude. (*See* Dkt. # 63.)

### C. "No Heat" Call and Float Ball

At some point on January 13 or January 14, Pollard called DJ McConnell Co. HVAC Services ("DJ McConnell Co.") because the heat was not working in the building. The parties dispute when this call took place. Plaintiff asserts that it was the morning of January 14, 2015—after the loss. (Dkt. # 62, Pg. ID 1279-80.) In support, Plaintiff points

---

[4] Plaintiff has filed a motion *in limine* to exclude the Solomon repair invoices as hearsay. (*See* Dkt. # 114.)

6

to phone records showing a call from Pollard's cell phone to a DJ McConnell Co. cell phone at 9:52 a.m. (*See* Dkt. # 62-25, Pg. ID 1537; Dkt. # 62-26, Pg. ID 1552.)

Landmark contends that the January 14 call was not the first call for service (Dkt. # 82, Pg. ID 5112), and points to a handwritten invoice dated January 13, 2015 (Dkt. # 84-4, Pg. ID 5279-80.) Dave McConnell, the owner, testified that he takes customer calls on both his cell phone and the business's landline, (*Id.* at Pg. ID 5278) but could not recall on which line the call came in. (*Id.* at Pg. ID 5281-83.) Defendant avers that it requested the landline records, but they have not been produced. (Dkt. # 82, Pg. ID 5111.) McConnell testified that he could not remember when he got the service call, but it was either on the 13th or the 14th. (Dkt. # 84-4, Pg. ID 5281.)

McConnell described the work performed as follows:

> Well, it was we were called for no heat. And we checked the steam convertor and controls, and we found the steam trap for the convertor not passing—not passing anything, no steam, no liquid. And we found that the float ball in the trap had some sort of a hole in it and it filled full of water and it was causing the trap to think that it was empty and causing it to plug up the steam flow through the system, through the convertor. Discussed it with the customer and they said they had a source for the float ball and said they would take care of it.

(*Id.* at Pg. ID 5280.) McConnell could not recall who he had spoken to the float ball about. (*Id.*) He testified that the steam trap was not hot to the touch like it would be if it were operating, and quickly determined that there was heat coming in from the street, but not heat going into the building. (*Id.* at Pg. ID 5285-86.) According to an invoice from The Macomb Group, a replacement steam trap was ordered on January 14, 2015, at 2:28 p.m.[5] (Dkt. # 62-28, Pg. ID 1559.)

---

[5] Defendant contends that this invoice does not support the proposition that the replacement was ordered on January 14. (*See* Dkt. # 82, Pg. ID 5112.) Defendant points to a "Net Due Date" of February 26, 2015 and a "Disc[ount] Due Date" of

7

Pollard testified that the frozen pipe in the penthouse, combined with the problems with the float ball, led him to believe that the heat was not on at the time of the loss. (Dkt. # 84-9, Pg. ID 5329-31.) The float ball is the subject of another motion to exclude. (*See* Dkt. # 121.)

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted).

In evaluating a summary judgment motion, "the court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Summary judgment is not appropriate when "the evidence presents a sufficient

---

February 6, 2015, (Dkt. # 62-28, Pg. ID 1559), and quotes the testimony of its expert Michael Dowdall saying, "The discount dates and the net due dates don't jive with the order date and the pickup dates." (Dkt. # 83-1, Pg. ID 5190.) Defendant does not explain what he means by the dates failing to "jive" or how "Net Due Date" and "Disc[ount] Due Date" fail to "jive" with the order date—which indicates that the ball was ordered on January 14.

8

disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). To do so, the evidence must amount to more than a "scintilla." *Id.* ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."). However, if that threshold is reached, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

## III. DISCUSSION

Plaintiff's motion requests that the court find that, as a matter of law, the loss is covered under the Policy. (Dkt. # 62, Pg. ID 1273.) To reach that finding, Plaintiff asks the court for two related findings: First, that the Policy excludes coverage for water damage caused by frozen pipes only if Defendant can show that Plaintiff failed to use "best efforts" to maintain heat above 55 degrees in the building. (*Id.*) And second, that there is no genuine dispute that Plaintiff did, in fact, use "best efforts" within the meaning of the Policy. (*Id.* at 1273.)

### A. Policy Interpretation

The court has diversity jurisdiction under 28 U.S.C. § 1332. Federal courts exercising diversity jurisdiction apply the law of the forum state. *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 302 (6th Cir. 2008). Michigan insurance law governs here, as both parties tacitly acknowledge in their briefing.

Under Michigan law, an insurance contract is generally interpreted like any other contract—according to Michigan contract interpretation principles. *Stryker Corp. v. ZL*

9

*Ins. Am.*, 735 F.3d 349, 354 (6th Cir. 2012); *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 703 N.W.2d 23, 26 (2005). The meaning of a contract is a question of law. *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776, 780 (2003). The policy application, declarations page, amendatory endorsements, and the policy itself constitute the contract. *See Royal Prop. Grp., LLC v. Prime Ins. Syndicate, Inc.*, 267 Mich. App. 708, 715, 706 N.W.2d 426, 432 (Mich. App. 2005) (*citing Hall v. Equitable Life Ass. Soc'y of the U.S.*, 295 Mich. 404, 408, 295 N.W. 204, 206 (1940)). A contract should be read as a whole instrument, with the goal of enforcing the intent of the parties. *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1350 (6th Cir. 1996). Ambiguous terms are to be construed in favor of the insured—however the court must not create ambiguity where none exists. *Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 111, 595 N.W.2d 832, 837 (1999) (citations omitted). Where there is no ambiguity, the court must enforce the terms of the contract as written, in accordance with their commonly used meanings and taking into account the reasonable expectations of the parties. *Id.* (citations omitted).

The "Protective Safeguards—Form Change" endorsement explicitly replaces Item B on the "Protective Safeguards" endorsement. (Dkt. # 62-1, Pg. ID 1324.) So modified, Item B on the "Protective Safeguards" endorsement adds a provision to the "Exclusions" section of the "Causes of Loss—Special Form" page in the policy. (*Id.*) The added provision states "We will not pay for loss or damage caused by or resulting from applicable causes of loss specified below, if prior to the loss, you . . . [f]ailed to maintain any protection safeguard listed in the schedule above, and over which you had control, in complete working order." (*Id.*) Below, the form specifies "Water Damage" and

provides that "Water Damage applies to Warrant Heat maintained at 55 degrees." (*Id.*) Part A of the "Protective Safeguards" endorsement provides that "Heat maintained at 55 degrees" is added to the "Commercial Property Conditions" form. (*Id.* at 1341.)

Thus, the endorsements add a condition and an exclusion to the policy. Coverage is conditioned on maintaining heat at (presumably at least) 55 degrees. Losses caused by water damage are excluded to the extent that Plaintiff failed to maintain the heat at 55 degrees prior to the loss. If, as Defendant contends, pipes froze and burst because Plaintiff failed to keep the building above 55 degrees, the exclusion applies and the condition is unsatisfied regardless of whether Plaintiff used "best efforts" to maintain the heat.

Plaintiff's contention that "to the extent there is any conflict or ambiguity between policy provisions, such ambiguity must be resolved in 455's favor" (Dkt. # 62, Pg. ID 1283) ignores the longstanding principle that "conflicts between the terms of an endorsement and the form provisions of an insurance contract are resolved in favor of the terms of the endorsement." *McKusick v. Travelers Indem. Co.*, 246 Mich. App. 329, 340, 632 N.W.2d 525, 532 (2001) (citing *Hawkeye-Security Ins. Co. v. Vector Constr. Co.*, 185 Mich. App. 369, 380, 460 N.W.2d 329 (1990)). Thus, Plaintiff's argument that the loss form's "best efforts" provision should be applied for water damage resulting from freezing because it is "more specific" than the protective safeguard endorsements (Dkt. # 62, Pg. ID 1233) is misguided.

The "best efforts" provision, to the extent it conflicts with the amendatory endorsements, is abrogated by the endorsements irrespective of whether it is more specific. *See McKusick*, 246 Mich. App. at 340. Further, the policy is unambiguous. To

be sure, combining the form policy with multiple endorsements that do not explicitly modify or replace the "best efforts" provision is not ideal. But the mere fact that the contract language is difficult to assemble because it is spread across multiple forms does not render it ambiguous—"an insurance contract is not ambiguous if it fairly admits of only one interpretation." *Id.*at 338. (citing *Matakas v. Citizens Mut. Ins. Co.*, 202 Mich. App. 642, 649-650, 509 N.W.2d 898 (1993). The language here, once the amendatory endorsements are applied, forecloses Plaintiff's interpretation.

As the court concludes that coverage does not turn on a question of whether Plaintiff used "best efforts" to maintain the Building's temperature, the court finds that Plaintiff's pending motion to preclude Defendant from arguing that Plaintiff failed to use best efforts (Dkt. # 112) is moot. The court will terminate the motion accordingly.

### B. Factual Dispute

Considering only the evidence in the record not subject to a pending motion to exclude, the court finds there to be a genuine dispute as to whether the buildings heat was maintained above 55 degrees as required in the policy. Wagner's testimony that the building felt "really cold" (Dkt. # 84-14, Pg. ID 5368) and that there was ice built up on the inside of the windows (Dkt.# 133-2, Pg. ID 9518) when he arrived on January 13 creates a question of fact as to whether the building's temperature was maintained above 55 degrees. The court is required to draw all reasonable inferences in favor of the nonmoving party, *Sagan*, 342 F.3d at 497, and testimony that the Building was cold and the interiors of the windows coated with ice the day the loss was discovered fairly suggests that the Building had not, in fact, been kept above 55 degrees throughout the preceding days. While this evidence may not be overwhelming, the court may not weigh

the evidence or make credibility judgments at this stage. *Moran*, 788 F.3d at 204. Because facts material to policy coverage are the subject of a genuine dispute, the court must deny Plaintiff's motion.

### IV. CONCLUSION

IT IS ORDERED that Plaintiff's unopposed motion to for leave to file an amended reply brief (Dkt. # 155) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for partial summary judgment (Dkt. # 62) is DENIED.

IT IS FURTHER ORDERED that Plaintiff's related motion *in limine* (Dkt. # 112) is TERMINATED AS MOOT.

                                                    s/Robert H. Cleland             /
                                                    ROBERT H. CLELAND
                                                    UNITED STATES DISTRICT JUDGE

Dated: July 28, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 28, 2017, by electronic and/or ordinary mail.

                                                    s/Lisa Wagner                 /
                                                    Case Manager and Deputy Clerk
                                                    (810) 292-6522