## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| 455 COMPANIES LLC, | HON. ROBERT H. CLELAND |
| Plaintiff, | MAGISTRATE JUDGE STEPHANIE DAWKINS DAVIS |
| v. | Case No.: 16-CV-10034 |
| LANDMARK AMERICAN INSURANCE COMPANY, | |
| Defendant. | |

## PLAINTIFF 455 COMPANIES LLC'S TRIAL BRIEF

## INTRODUCTION

### A. Insured Premises

Plaintiff, 455 Companies LLC ("455") owns the building located at 455 W. Fort Street, Detroit, MI, which is known as the Cass Building (the "Building" or the "Insured Premises"). 455 purchased the 114,000 square foot, five-story commercial building, which includes a basement and two small rooftop mechanical rooms, in and around June 2014. The building, and the adjacent parking lot, are owned by Phil Katz and his family. Although Mr. Katz is from New York, he believes in the potential of the Detroit area, and has invested his family's funds in downtown Detroit by

purchasing other office buildings, including the Guardian Building and what was formerly called the Chase Tower.  When 455 purchased the Building, it had been vacant for nine months after the tenant, Detroit Works, relocated its offices to a City of Detroit facility.  (**Ex. 1** (Ex. 11 to Pl.'s Resp. & Memo. of Law in Opp'n to Def.'s Partial Summ. J. Mot., Feb. 17, 2017, Dkt. No. 90-11), at Landmark UW 00096.)

### B. Landmark Insurance Policy

Mr. Katz insured the Building with Defendant, Landmark American Insurance Company ("Landmark," and, together with 455, the "Parties"), under an all-risk commercial property insurance policy which provided coverage for direct physical loss of or damage to covered property caused by or resulting from any covered cause of loss (the "Policy").  (**Ex. 2** (Stip. Ex. 1), at 455 Co. LLC 000368.)  The Policy is identified as policy number LHD388678, with effective dates from July 8, 2014 to July 8, 2015.  (*Id.* at 455 Co. LLC 000342.)  The Policy provides coverage for the Building, with limits of insurance of $15,000,000.00 and a $25,000 per occurrence deductible, on a replacement cost basis with "Special" shown under "Covered Causes of Loss".  (*Id.* at 455 Co. LLC 000345, 347, Commercial Property Coverage Part Declarations, "Coverages Provided" and "Optional Coverages," and "Deductible and Period of Restoration Endorsement.")  At

the time it issued the Policy, Landmark knew the Building was vacant, as stated on the "Commercial Property Coverage Part Declarations" and "Vacancy Permit" Endorsement – CP 04 50 07 88 - forms of the Policy. (*Id.* at 455 Co. LLC 000345, 385.)

The Policy includes an attachment titled "Causes of Loss – Special Form" – CP 10 30 06 07 – that states:

**A. Covered Causes of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

**1.** Excluded in Section **B**., Exclusions; or

**2.** Limited in Section **C**., Limitations;

that follow.

**B. Exclusions**

. . .

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

. . .

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

3

> **(2)** You drain the equipment and shut off the supply if the heat is not maintained.

(*Id.* at 455 Co. LLC 000386-88.)   This broad definition includes coverage for the risk of direct physical loss from water damage. Further, even in the context of certain of the Policy's enumerated "limitations" on coverage, the Policy provides coverage for "specified causes of loss" which the Policy defines to include water damage. (*Id.* at 455 Co. LLC 000394-95.)

The Policy also includes two "Protective Safeguards" endorsements, which provide: "Heat maintained at 55 degrees" and that Landmark "will not pay for loss or damage caused by or resulting from applicable causes of loss specified below, if prior to the loss, [the insured]: a) Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or b) Failed to maintain any protection safeguard listed in the schedule above, and over which you had control, in complete working order."  (*Id.* at 455 Co. LLC 000365-67.) Under the "Applicable Cause(s) of Loss," section of "Protective Safeguards – Form Change" the Policy states: "Water Damage applies to Warrant Heat maintained at 55 degrees."   (*Id.* at 455 Co. LLC 000367, "Protective Safeguards – Form Change, Form RSG 44025 0304.)

4

### C. <u>Maintenance of the Insured Premises</u>

455 paid its utility bills faithfully for the express purpose of maintaining heat in the building.  (**Exs. 3-4** (Exs. E-F to 455 Mot. for Summ. J., Jan. 19, 2017 ("455 SJ Mot."), Dkt. Nos. 62-5, -6), Detroit Thermal Invoices and payment check.)    Landmark's retained claim-adjusting company, Engle Martin, acknowledged that, according to December 2014 and January 2015 utility records, that heat was being maintained in the Building.  (**Exs. 5-6** (Exs. G-H to 455 SJ Mot., Dkt. Nos. 62-7, -8).)    455 paid COMM Group $1,000 per month to maintain the Building at a level that made it welcoming to prospective tenants, which included maintenance of heat in the Building, and to conduct floor-by-floor walk throughs of the Building on a regular basis. (**Exs. 7-8** (Exs. I-J to 455 SJ Mot., Dkt. Nos. 62-9, -10).)  Mr. Katz selected COMM to maintain the Building because he had a history of positive dealings with Gary Torgow, COMM's founder, through Mr. Katz's prior investments in other commercial properties in Detroit.  (**Exs. 7, 9-10** (Exs. K-L to 455 SJ Mot., Dkt. Nos. 62-11, -12).) Moreover, the Building was previously owned and managed by Mr. Torgow and COMM.  (**Ex. 7**.)  In addition, the headquarters for the COMM Group were located in the building next to 455's Building, which was also owned by Mr. Torgow.  (**Ex. 11** (Ex. M to 455 SJ Mot., Dkt. No. 62-13).)

5

### D. <u>Water Damage Loss</u>

A water leak was discovered in the Building the morning of January 13, 2015 (the "Loss").  (**Ex. 12** (Ex. O to 455 SJ Mot., Dkt. No. 62-15).)  COMM's then-Director of Operations, Michael Brugger, was notified of the water leak and rushed to the Building from his office located next door.  (*Id.*)  Upon arrival, Mr. Brugger found large volumes of water from a water pipe break he traced to a restroom on the fifth floor of the Building.  (*Id.*)  After shutting off the water, Mr. Brugger checked the temperature and pressure of the baseboard heat recirculation system in the Building.  (*Id.*)  He found that the baseboard heat was warm to the touch and that the pumps were operating.  (*Id.*)

Within an hour and a half of discovery of the loss, Mr. Brugger confirmed that the thermometer and pressure gauges of the baseboard recirculation water pumps showed that 160-degree heat was provided to the Building, and that information was memorialized through photographs contemporaneously taken by Mr. Brugger.  (*Id.*; *see also* **Exs. 13-16** (Exs. P-S to 455 SJ Mot., Dkt. Nos. 62-16 to -19) (Photographs).)  The metadata from those photographs verifies that the images were taken on January 13, 2015 between 12:04 p.m. and 12:06 p.m., corroborating Mr. Brugger's testimony that he arrived at the Building mid-morning on January 13, 2015

6

and took photographs of the baseboard heating system's temperature and pressure gauges within an hour and a half of his arrival. (**Exs. 17-20** (Exs. U-X to 455 SJ Mot., Dkt. Nos. 62-21 to -24).) Matthew Pollard, then-facility manager assigned by COMM to the Building, found that, over the course of his management of the Building, maintaining a reading of 160 degrees Fahrenheit on the baseboard heating system kept the Building's temperature between 55 and 60 degrees Fahrenheit. (**Ex. 11**.)

The next day, January 14, 2015, Mr. Pollard called DJ McConnell HVAC Services because the Building's heating system was no longer working. (*Id.*; *see also* **Exs. 21-22** (Exs. Y-Z to 455 SJ Mot., Dkt. Nos. 62-25, -26) (telephone bills for Messrs. Pollard and McConnell confirming the call between them at 9:52 a.m. on January 14, 2015).)

455 reported the water intrusion loss to Landmark immediately after its discovery and retained Signal Restoration Services ("Signal") to perform emergency water extraction work in order to mitigate the loss, which commenced on January 13, 2015.

## SUMMARY OF PLAINTIFF'S CLAIMS IN THIS LITIGATION

### I.    Breach of Contract

Under Michigan law, to prevail on a claim for breach of contract, 455 must first establish the elements of a valid contract. Those elements are

(1) parties competent to contract; (2) proper subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. *See, e.g.*, *Hess v. Cannon Township*, 265 Mich. App. 582, 592, 696 N.W.2d 742 (2005). Once a valid contract has been established, 455 must prove (1) the terms of the contract; (2) breach of the terms by Landmark; and (3) injury to 455 resulting from the breach. *See, e.g.*, *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 817, 822 (E.D. Mich. 2014).

455 anticipates that all but two of these elements will be easily amenable to proof and uncontested by Landmark. The contract at issue in this case is a property insurance policy common in the industry sold by a sophisticated party—Landmark, an insurance company—to 455, an owner of commercial real estate. Thus, the elements of a valid contract should be stipulated or, if not, subject to easy proof at trial.

Similarly, the terms of the contract are not in dispute between the Parties. The Policy specifically provides coverage for "water damage," which the Policy defines as "accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam." 455 seeks coverage for

8

such "water damage" sustained in January 2015 to the Insured Premises, with water discharging from a broken pipe in the fifth-floor women's restroom of the Insured Premises. Thus, that the Policy provides coverage for the exact type of damage suffered by 455 is not reasonably in dispute.[1]

The rules of construction for insurance contracts are the same as those for any other written contract. *Comerica Bank v. Lexington Ins. Co.,* 3 F.3d 939, 942 (6th Cir. 1993). First, a court must determine whether the contract language at issue is ambiguous or unambiguous. Second, the court must construe the contract. The question of whether a contract is ambiguous is a question of law for the court. *Mayer v. Auto-Owners Ins. Co.,* 127 Mich. App. 23, 27, 338 N.W.2d 407 (1983). Construction of a contract also is a question of law for the court. *Fragner v. Am. Comm. Mut. Ins. Co.,* 199 Mich. App. 537, 540, 502 N.W.2d 350 (1993).

The function of the court is to determine and give effect to the parties' intent as discerned from the policy's language, looking at the policy as a whole. *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 563, 489

---

[1] Landmark's new position that that the Policy somehow "excludes water loss and damage, but gives back coverage if and only if the terms and conditions of the Protective Safeguards Endorsement and Protective Safeguards - Form Change have been fully complied with" rests on a fundamental misreading of the Policy. As stated, the Policy, in the first instance, explicitly covers "water damage." Coverage for "water damage" is then excluded if, at the time of the loss, the heat is not maintained at 55 degrees.

N.W.2d 431 (1992).  If a contract is clear and unambiguous, the court must enforce the contract as written, according to its plain meaning, *Clevenger v. Allstate Ins. Co.*, 443 Mich. 646, 654; 505 N.W.2d 553, 557 (1993), without looking to extrinsic evidence.  *Upjohn Co. v. N.H. Ins. Co.*, 438 Mich. 197, 205 n.6, 476 N.W.2d 392 (1991).  Policy language in an insurance contract is to be given its ordinary meaning unless it is apparent from a reading of the whole instrument that a different or special meaning was intended. *Sump v. St. Paul Fire & Marine Ins. Co.*, 21 Mich. App. 160, 175 N.W.2d 44 (1970); *Ford Motor Credit Co. v. Aetna Cas. & Surety Co.*, 717 F.2d 959 (6th Cir. 1983).  It is improper for the court to ignore the plain meaning of the policy's language in favor of a technical or strained construction.  *Arco Indus. Corp. v. Travelers Ins. Co.,* 730 F. Supp. 59, 66 (W.D. Mich. 1989). A contract which admits of but one interpretation is unambiguous.  *Fragner*, 502 N.W.2d at 352.

In contrast, a contract provision is ambiguous if it is capable of two or more constructions, both of which are reasonable.  *Petovello v. Murray,* 139 Mich. App. 639, 642, 362 N.W.2d 857 (1984).  If the insurance contract is deemed ambiguous and susceptible to two different interpretations, the interpretation that is most favorable to the insured must be adopted. *Century Boat Co. v. Midland Ins. Co.*, 604 F. Supp. 472 (W.D. Mich. 1985).

When the policy is found to be ambiguous, the court must determine the intent of the parties and may look to extrinsic evidence, such as custom and usage. *Mich. Millers Mut. Ins. Co. v. Bronson Plating Co.*, 197 Mich. App. 482, 495, 496 N.W.2d 373 (1992). "Perhaps the most common of extrinsic aids to the construction of an insurance policy or other contract is usage and custom." *Allstate Ins. Co. v. Freeman,* 432 Mich. 656, 712-13, 443 N.W.2d 734 (1989).

Under Michigan law, it is the insurer's responsibility to clearly express limits on coverage. *Auto Club Ins. Ass'n v. DeLaGarza*, 433 Mich. 208, 444 N.W.2d 803 (Mich. 1989). Thus, insurance exclusion clauses are construed strictly and narrowly. *Churchman*, 489 N.W.2d at 435.

The primary area of dispute on the breach of contract claim will be whether Landmark breached the terms of the Policy. Here, Landmark has denied coverage for the Loss on the sole ground that the Loss is barred by the "Protective Safeguards" exclusion in the Policy that requires heat to be maintained at 55 degrees Fahrenheit. Under Michigan law, it is Landmark's burden to prove the applicability of that policy exclusion or limitation, and the exclusion will be strictly construed in favor of the insured. *See, e.g.*, *Hunt v. Drielick*, 496 Mich. 366, 373, 852 N.W.2d 562 (2014); *Morrill v. Gallagher*, 370 Mich. 578, 587, 122 N.W.2d 687 (1963); *Shelton v.*

11

*Auto-Owners Ins. Co.*, 318 Mich. App. 648, 657, 899 N.W.2d 744 (2017);

*Monteleone v. Auto Club Grp.*, 113 F. Supp. 3d 950, 959 (E.D. Mich. 2015);

*Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pa.*, 916 F. Supp. 2d 813, 822

(W.D. Mich. 2013); *Roddis Lumber & Veneer Co. v. Am. Alliance Ins. Co. of

N.Y.*, 330 Mich. 81, 88, 47 N.W.2d 23 (1951); *Ososki v. St. Paul Surplus

Lines*, 156 F. Supp. 2d 669, 674-75 (E.D. Mich. 2001); 6 Couch on Ins. §

81:19 (3d Ed. Dec. 2017) (noting that clauses in insurance contracts which

provide that a policy shall become void or its operation defeated or

suspended or the insurer relieved wholly or partially from liability upon the

happening of some event, or the doing or omission to do some act, are

conditions subsequent and are matters of defense to be pleaded and

proved by the insurer).

It is undisputed that pipe bursts are covered under the Policy unless

Landmark can show that, at the time of the Loss, 455 did not maintain the

heat at 55 degrees.[2]  As Landmark recognized in a formal pleading in this

---

[2] Irrespective of whether the endorsement is identified in the policy as a condition or exclusion, in practice, the Michigan Supreme Court has held repeatedly that the insurer bears the burden to prove breach of a policy provision that excludes coverage for a particular category of loss based on an act or omission of the insured.  *See Molnar v. Cent. Mut. Auto Ins. Co. of Detroit*, 242 Mich. 41, 42, 217 N.W. 770 (1928) (where policy conditioned coverage on the insured using a lock in his car and maintaining the lock, breach of this condition needed to be "alleged *and proved* by defendant" (emphasis added)); *Archambo v. Lawyers Title Ins. Corp.*, 466 Mich. 402,

action, "Landmark's burden at trial is to prove the exclusion, i.e., that the building's heat was not maintained at 55 degrees."[3]  Landmark cannot meet this burden.  Landmark and its agents, including its first two experts, had virtually unfettered access to the Insured Premises in the days after the Loss was discovered, and the opportunity to measure temperature and water pressure anywhere they chose within the Insured Premises, but chose not to do so.  Landmark has admitted numerous times that heat was, in fact, maintained in the building.  Further, although Landmark has retained three engineers on this issue, their opinions are wildly inconsistent, both with the factual record, and each other.

First, Landmark's initial retained expert reported that the heat only

---

405, 646 N.W.2d 170 (2002) (finding that policy commitment that conditioned effectiveness of the policy on the insured informing the insurer of known liens was not a condition precedent, but a condition *subsequent*, because the condition "speaks to voiding part of a subsequently issued policy, not to avoiding the obligation to *issue* a policy," and because it was "not a condition precedent to the effectiveness of the *entire* policy" (emphasis added)); *Curth v. N.Y. Life Ins. Co.*, 274 Mich. 513, 521, 265 N.W. 749 (1936) (finding that policy condition that excluded coverage in the event of suicide by the insured was a condition subsequent and the burden rested on the insurer); *see also Farm Bureau Mut. Ins. Co. of Ark., Inc. v. Future Davenport*, 519 S.W.3d 702, 705 (Ark. 2017) (where policy stated, in its "Conditions" section, that the insurer would only cover loss if the insured fails to occupy the premises for thirty days, the court found that this provision was an exclusion and that the burden of proof was on the insurer).

[3] Dkt. No. 82, at 18.

shut off after the Loss as a result of the repair of the broken water pipe. Landmark summarily discharged that expert and replaced him with a second expert who opined that the pipe on the fifth floor broke not because the building itself was inadequately heated, but rather because a rooftop line exposed to the outdoors may have frozen, which led to a build-up of pressure in the interior fifth-floor pipe itself.  In fact, in her official report, Landmark's second expert conceded that "steam utility records confirmed heat was provided to the fifth and lower floors," and there was "heat inside the building's five floors" prior to the heat being turned off after the Loss was discovered.

Because its first two experts' theories undermined its defense, Landmark retained a third expert who claimed for the first time that the fifth-floor interior pipe froze due to a gust of wind that may have traveled horizontally into a rooftop mechanical room, then dropped vertically through an air vent into the fifth floor, and then horizontally again through small holes in the wall to reach the fifth-floor pipe.  This third Landmark expert's speculative theory was directly refuted by Landmark's second expert who opined that the alleged freezing of the fifth-floor pipe—deep in the interior of the building and away from the windows—was "not possible."

Further, there is undisputed evidence that the heat was adequately

14

maintained at the time of the Loss.  Invoices prove that 455 purchased steam heat for the Insured Premises in an equivalent quantity at the time of the Loss as it had in prior winter months.  Temperature records show that the prior winter had been far colder, but no water loss occurred. Photographs of the temperature and pressure gauges taken by the first responder to the Loss confirm that the building was properly heated with 160-degree water, which circulated through the building to reach all five floors at the time of the Loss to ensure the building temperature remained between 55 and 60 degrees.  455's expert has opined consistently with this evidence.

Finally, as Landmark has conceded, it must also demonstrate that 455's alleged failure to maintain heat at 55 actually resulted in the Loss.  As this Court ruled: "If, as Defendant contends, pipes froze and burst <u>because</u> Plaintiff failed to keep the building above 55 degrees the exclusion applies and the condition is unsatisfied. . . ."[4]  *Lakeland Asphalt Corp. v. Westfield Ins. Co.*, No. 1:10-CV-887, 2012 WL 360293, at *3 (W.D. Mich. Feb. 2, 2012) ("In the absence of specific contractual language to the contrary, Michigan courts have long applied the 'proximate cause' standard to determine if coverage was precluded by the occurrence of a particular

---

[4] Dkt. No. 158, at 11 (emphasis added).

event."). Because Landmark cannot demonstrate that the heat was maintained below 55 at the time of the Loss, it cannot meet this burden.

A secondary issue will have to do with the final element of the claim, proving 455's injury as a result of Landmark's alleged breach. The dispute is not over *whether* 455 was injured; Landmark has not paid any amounts to cover 455's damage, and both Parties agree that there is, at least, several million dollars in damage to the Insured Premises as a result of the Loss. The dispute is over the monetary value of the damage 455 sustained. The Parties have competing experts, each with his own estimate of the replacement cost value of the damage the building sustained.[5] It is 455's position that the issues raised by Landmark's expert to lower his overall estimate are baseless and not supported by fact, law, or common sense. 455 has suffered injury in the amount of its expert's estimate of replacement cost damages ($3,397,723.95), as well as $1,286,592.31 in mitigation costs as of November 30, 2017, based on the last invoice from mitigation contractor Signal Restoration Services, an

---

[5] Landmark moved for a partial summary judgment ruling that 455 is not entitled to replacement cost because 455 had not yet repaired or replaced the Insured Premises. The Court denied that motion, holding that (1) 455 is entitled to full replacement cost value when it replaces the Insured Premises at the current location or at a different location, and (2) if 455 demonstrates that Landmark acted in bad faith, then 455 is entitled to immediate replacement cost value of the Loss. Dkt. No. 159, at 10-12.

amount which continues to increase with interest.  Thus, 455 seeks at least

$4,684,316.26 in combined replacement and mitigation costs and should

be awarded that amount, plus any additional interest accrued on the

mitigation costs by the time of judgment, in compensatory damages (the

"Claim").[6]

## II. Declaration that the Loss is Covered Up to the Policy Limit

Declaratory relief is available when there is an actual controversy,

which exists where a declaratory judgment is necessary to guide a litigant's

future conduct in order to preserve his legal rights, within the jurisdiction of

the court.  *See* 28 U.S.C. § 2201-02; *Home-Owners Ins. Co. v. Allied Prop.*

---

[6] In its Defendant's Claims section, Landmark states that "Plaintiff's present claim includes . . . mold damage in excess of the Policy's sublimited coverage of $15,000 . . . and excluded asbestos . . . ."  This is not accurate; 455's damages submitted to date specifically exclude amounts for asbestos remediation, and no mold existed in the Building prior to the Loss.  The only mold was that which grew out of Landmark's refusal to allow Signal to properly address the water damage, and Landmark cannot sublimit remediation of conditions which grew out of its acts or omissions. Landmark further claims that "Plaintiff failed to take action following the loss to mitigate its damages."  This too is false; remediation contractor Signal Restoration Services was retained *the day the Loss was discovered* and immediately set to work addressing the damage caused by the Loss. Finally, Landmark states that additional coverage for increased cost of construction is only available if construction is completed within two years after the Loss occurred.  The Court has ruled that 455 is excused from complying with such conditions if Landmark has made performance impossible.  Dkt. No. 159, at 11-12.  Even so, 455 has not included increased cost of construction in its claim; this is yet another straw man argument set up by Landmark.

& *Cas. Ins. Co.*, 152 F. Supp. 3d 956, 962 (W.D. Mich. 2016) (citing *U.S. Aviex Co. v. Travelers Ins. Co.*, 125 Mich. App. 579, 585, 336 N.W.2d 838 (1983)).   Again, the elements of this cause of action are undisputedly present—there is a controversy between 455 and Landmark over 455's Claim, and this Court has jurisdiction.

There is a dispute over the nature of the declaratory judgment to be awarded.   455 advocates for a declaratory judgment that its Claim is within the Policy's coverage grant and that Landmark cannot meet its burden to show that any exclusion bars coverage for the Claim.

### III. 455's Entitlement to Penalty Interest Under MCL 500.2006

The elements of a claim for violation of the statute are that: (1) benefits are not paid on a timely basis under an insurance policy, and (2) that the insurer has received satisfactory proof of loss from the policyholder.   If those two conditions are met, the policyholder is entitled to payment of 12% penalty interest on the amount of the claim.   Mich. Comp. Laws § 500.2006; *Nickola v. MIC Gen. Ins. Co.*, 500 Mich. 115, 894 N.W.2d 552, 555-61 (2017); *Griswold Props., L.L.C. v. Lexington Ins. Co.*, 276 Mich. App. 551, 564–66, 741 N.W.2d 549 (2007) (recognizing that a first-party policyholder does not have to show that its claim was not reasonably in dispute or bad faith to recover under Mich. Comp. Laws

§ 500.2006).

Although Landmark contends that 455 is not entitled to interest because it did not provide a formal "proof of loss," the Policy provides that 455 must send a signed, sworn proof of loss to Landmark "within 60 days after [Landmark's] request," and states "We [Landmark] will supply you with the necessary forms."   At no time prior to May 13, 2015, did Landmark request a proof of loss from 455 or provide any forms for a proof of loss. Under Michigan law, where the insurer never requests a proof of loss, it cannot later use the fact that it never made such a request as a defense to penalty interest; rather, such interest is deemed to commence 60 days after the policyholder provided notice of the claim.   *See Mathis v. Encompass Ins. Co.*, No. 06-CV-13837, 2008 WL 919934, at *4 (E.D. Mich. Apr. 3, 2009) (holding that where a policyholder had provided notice of claim, the insurer had received notice and established a claim number but never thereafter specified in writing what constituted satisfactory proof of loss, the calculation of penalty interest began sixty days after the policyholder submitted notice of the loss).

In this case, 455 provided initial notice of the Loss to Landmark on January 14, 2015.  Landmark assigned personnel to handle the Claim and worked with a remediation contractor, directing it over the course of four

months to address and remediate the damage.  Yet on May 13, 2015, after that work was complete and after that remediation contractor had charged more than $1.2 million for its work, Landmark abruptly denied coverage for the Loss and in so doing breached the Policy.  What is worse, *Landmark* instructed its representatives to quit working with 455's representatives who were attempting to complete their determination of the total amount of the Loss.  Specifically, on May 28, 2015, when 455's adjuster reached out to Landmark's estimator, he was told curtly that Landmark's estimator "has final invoiced this claim and closed our file.  I don't mean to sound petty, but I can't put work into something I can't invoice."  As this Court stated in its August 9, 2017 Opinion and Order, "[I]f an insurer hinders an insured's performance of a condition precedent, that performance is excused on equitable grounds."[7]

Here, by failing to request a proof of loss, by failing to provide the necessary forms, and by refusing to engage 455's adjuster in developing the total loss amount for such a proof of loss, Landmark prevented 455 from complying with the Policy provision.  Accordingly, 455's performance is excused and Landmark must pay full penalty interest on the total amount owed under the Policy, commencing from 60 days after the date of notice,

---

[7] Dkt. No. 159, at 11-12.

January 14, 2015.

## IV. ANTICIPATED EVIDENCIARY AND WITNESS PROBLEMS

### A. The Brugger Photographs

The evidence in this case which Landmark most fears, and therefore has attacked the most vitriolically, are the photographs taken by Michael Brugger on January 13, 2015, within one and a half hours of his arrival after being advised of the water intrusion in the Building (the "Brugger Photographs").  As the Court is aware, Landmark has pulled out all of the so-called stops in an effort to preclude those photographs from being entered into evidence at trial.  Landmark knows that if those photographs are admitted into evidence all is lost for it in this case, and Landmark will have failed to carry its burden of proof on the applicability of the "Applicable Cause(s) of Loss," section of "Protective Safeguards – Form Change" wherein, as referenced above, the Policy states: "Water Damage applies to Warrant Heat maintained at 55 degrees."  (**Ex. 2**, at 455 Co. LLC 00367, "Protective Safeguards – Form Change, Form RSG 44025 0304.)  This is a condition subsequent, and, as such, Landmark bears the burden of proof to demonstrate that coverage is precluded because 455 did not maintain the heat in the Building at 55 degrees.  The Brugger Photographs prove that, at the time of the Loss, heat was maintained in the Building by 455 at or

above 55 degrees, and that Landmark has failed to meet its burden of proof.

Landmark's counsel is experienced and understands the import of the Brugger Photographs.  As such, despite the sworn deposition testimony of Mr. Brugger regarding when and how he took the Photographs, and thereafter maintained the Photographs, including production of the metadata which further confirmed his testimony, Landmark without a scintilla of evidence, attempts to bash Mr. Brugger and his credibility.  In fact, in its motion *in limine* on this topic (Dkt. No. 123), Landmark demonstrated its intention to attempt to mislead the jury on this evidence and to make scurrilous statements regarding the Brugger Photographs for which there is no evidence or support.

Landmark has made clear its intent at trial to contend that the Brugger Photographs were taken at a date and time other than as testified to by Mr. Brugger and confirmed through the associated metadata, simply because the photographs were taken with his mobile phone, which later broke, and the copies produced in discovery were pulled from "the cloud," as opposed to directly from the mobile phone itself.  Landmark argues that the photographs should be precluded from introduction as evidence at trial because the mobile phone was not preserved as Electronically Stored

Information ("ESI").  This argument is specious, and contrary to the evidence.

455 seeks to enter into evidence the actual photographs – not the mobile phone with which Mr. Brugger took the Brugger Photographs.  The photographs taken with Mr. Brugger's subsequently broken mobile phone were not lost and there was no failure to preserve ESI.  Instead, the Brugger Photographs were uploaded to the Verizon Cloud, along with their metadata, and, thus, this ESI has been preserved, much to Landmark's chagrin.

Federal Rule of Civil Procedure 37(e), "Failure to Preserve Electronically Stored Information," provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Not only was there no failure to maintain the Brugger Photographs, but 455 did not act in any way to deprive Landmark from use of the Brugger Photographs in this litigation.  Ironically, it is not the lack of the Brugger Photographs as to which Landmark complains; rather, it is the existence of the Brugger Photographs that has caused this attempt at character assassination by Landmark.  Mr. Brugger has laid the full foundation for the admissibility of the Brugger Photographs, and Landmark's efforts to preclude them must be seen for their own desperation.

### B. Other Landmark Arguments Contradicted by the Evidence

Contrary to the actual evidence developed in this case, Landmark has stated its intent to argue at trial:

- the heat *may* have been off at the time of the loss but restored some time before the Brugger Photographs were taken;

- the utility bills showing steam supply to the Building *may* have been in error;

- the Brugger Photographs *may* have been staged by removing water from the Building's steam trap in the basement utility room

to create temporary readings of 160 degrees on the system's thermometer;

- the metadata on the Brugger Photographs *may* have been manipulated;

- Mr. Brugger's mobile phone *may* have "disappeared" or was otherwise replaced under mysterious circumstances;

- there *may* have been a previous call to DJ McConnell prior to January 14, 2015;

- the rooftop mechanical room heater *may* not have been set or working properly; and

- the heat trace cable around the rooftop mechanical room water pipe *may* not have been working or sufficient to keep the pipe from freezing.

Despite extensive fact and expert discovery, no evidence has been found to support any of these theories, yet Landmark continues to present them as if evidence to support them exists. Each of Landmark's flights of fancy referenced above is without support and each is rank speculation created from whole cloth to prejudice 455 and deflect the jury's attention from the actual evidence. As such, each is subject to preclusion by Federal Rules of Evidence 403 (precludes evidence if its probative value is

substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury) and 602 (requires witnesses to have personal knowledge and bars speculative evidence).

## IV.    **LANDMARK'S POLICY DEFENSES**

Landmark has asserted four coverage defenses to this matter:

1.    455's burden to prove compliance with the condition of coverage imposed by the Policy's Protective Safeguards Endorsements;

2.    The Protective Safeguard Endorsements' exclusion serves to bar liability for 455's water loss and damage;

3.    Certain of 455's claimed damages include undamaged items, excluded loss or damage otherwise sublimited by the terms of the Policy; and

4.    No interest is owed where 455 failed to submit a satisfactory proof of loss and where 455 otherwise failed to comply with Michigan Compiled Laws § 500.2006.

Each of these policy defenses is baseless and does not withstand scrutiny because they are contrary to controlling case law, factually inaccurate, and/or contrary to the controlling evidence.   An excellent example is Landmark's position on which party bears the burden of proof on the condition subsequent stated in the Policy as to maintaining heat at 55 degrees in the Building.

### A. 455's burden to prove compliance with the condition of coverage imposed by the Policy's Protective Safeguards Endorsements

As made clear above, the Protective Safeguards Endorsements, and particularly that 455 did not maintain heat in the Building at 55 degrees, is a burden of proof that is solely placed upon Landmark.  The Policy provides, as conditions subsequent, two "Protective Safeguards" endorsements, which require "heat maintained at 55 degrees" and that Landmark "will not pay for loss or damage caused by or resulting from applicable causes of loss specified below, if prior to the loss, [the insured]: a) Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or b) Failed to maintain any protection safeguard listed in the schedule above, and over which you had control, in complete working order." (**Ex. 2,** at 455 Co. LLC 000365-67.)   Under the "Applicable Cause(s) of Loss," section of "Protective Safeguards – Form Change" the Policy states: "Water Damage applies to Warrant Heat maintained at 55 degrees." (*Id.* at 455 Co. LLC 000367, "Protective Safeguards – Form Change, Form RSG 44025 0304.)

Under Michigan law, it is Landmark's burden to prove the applicability of that policy exclusion or limitation, and the exclusion will be strictly construed in favor of the insured.  *See, e.g.*, *Hunt v. Drielick*, 496 Mich.

27

366, 373, 852 N.W.2d 562 (2014); *Morrill v. Gallagher*, 370 Mich. 578, 587, 122 N.W.2d 687 (1963); *Shelton v. Auto-Owners Ins. Co.*, 318 Mich. App. 648, 657, 899 N.W.2d 744 (2017); *Monteleone v. Auto Club Grp.*, 113 F. Supp. 3d 950, 959 (E.D. Mich. 2015); *Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pa.*, 916 F. Supp. 2d 813, 822 (W.D. Mich. 2013); *Roddis Lumber & Veneer Co. v. Am. Alliance Ins. Co. of N.Y.*, 330 Mich. 81, 88, 47 N.W.2d 23 (1951); *Ososki v. St. Paul Surplus Lines*, 156 F. Supp. 2d 669, 674-75 (E.D. Mich. 2001); 6 Couch on Ins. § 81:19 (3d Ed. December 2017) (noting that clauses in insurance contracts which provide that a policy shall become void or its operation defeated or suspended or the insurer relieved wholly or partially from liability upon the happening of some event, or the doing or omission to do some act, are conditions subsequent and are matters of defense to be pleaded and proved by the insurer.).

### B. The Protective Safeguard Endorsements' exclusion serves to bar liability for 455's water loss and damage

Contrary to Landmark's contention, the "Protective Safeguard Endorsements' exclusion" does not "serve to bar liability for 455's water loss and damage," because the evidence is that the Building was heated to 55 degrees at the time of the Loss.  No evidence exists that the Building was not heated to 55 degrees.  Instead, the testimony and other evidence provided by Landmark's first expert, Isaac Sheppard; the employees of

Signal; the employees of COMM; the conflicting testimony of Landmark's second and third experts, Elizabeth Buc and D. Michael Dowdall; the billing records from Detroit Thermal; and 455's incentive to maintain the Building, including the heat, in a condition and at a temperature that would be conducive and appealing to potential tenants of the Building during their visits and inspections, proves that the Building was heated to 55 degrees or higher at the time of the loss.

### C. Certain of 455's claimed damages include undamaged items, excluded loss or damage otherwise sublimited by the terms of the Policy

Landmark bears the burden of proof and must delineate with specificity those items it contends are sublimited within the policy, or excluded from coverage.  455 is not seeking to recover from Landmark the cost for asbestos remediation in the Building, which totals approximately $150,000.  It is seeking to recover all costs associated with mold remediation, because no mold existed in the Building prior to the loss, and the only mold in the Building was the result of this water loss and was caused by Landmark's and Engle Martin's, the claim adjusting company retained by Landmark as its surrogate for this Loss, failure and refusal to properly scope the extent of the water intrusion and their rejection of Signal's water mitigation plan.  Landmark's/Engle Martin's refusal to allow

Signal to perform the full water mitigation plan it designed allowed mold to grow in certain confined and semi-confined spaces.   Ultimately, when Landmark/Engle Martin recognized their mistake and directed Signal to perform the full water mitigation it had originally recommended, mold had begun to grow.   Landmark is responsible for both remediation of the resulting mold and the duplicative costs incurred to redo certain portions of the water mitigation after Landmark/Engle Martin admitted their mistake.

Similarly, because 455 has made its prima facie showing of the scope of damages and work needing repair, Landmark bears the burden to prove any portions of the damage repair which it claims are unnecessary. Examples of the types of items that Landmark claims are not damaged, and therefore should not be replaced, are carpet sections adjacent to damaged carpet sections, and Landmark's contention that despite the inability to match the undamaged carpet section with replacement carpet, it is not responsible to replace all carpet that cannot be matched.  Similarly, in replacing ceiling tiles, Landmark contends it is only responsible for replacing those tiles which were damaged, and not for tiles that were not damaged but which, if not replaced, will not match the color of the adjacent new ceiling tiles.

30

As referenced in the "Introduction" section above, under "B. Landmark Insurance Policy," 455 purchased the optional Replacement Cost coverage, which provides, on page 14 of the Policy, "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form."  In addition, subpart e. of the Replacement Cost portion of the Policy states:

> **e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1), (2)** or **(3)**, subject to **f.** below:
>
> **(1)** The Limit of Insurance applicable to the lost or damaged property;
>
> **(2)** The cost to replace the lost or damaged property with other property:
>
> > **(a)** Of comparable material and quality; and
> >
> > **(b)** Used for the same purpose; or
>
> **(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

(**Ex. 2,** at 455 Co. LLC 000382.)  In compliance with the coverage provided by the Policy, 455's damages expert, Mark Stonier, prepared his estimate for repair of the Building to reflect, as is the norm in the industry, the cost to repair the damage with materials of like, kind and quality, and criticized Landmark's damage expert for not doing the same.

**D. No interest is owed where 455 failed to submit a satisfactory proof of loss and where 455 otherwise failed to comply with Michigan Compiled Laws § 500.2006**

One can only imagine the manipulative acts that would occur if an insurer were allowed to do that which Landmark suggests in this defense. The Policy states at Section E. "Loss Conditions" that:

> The following conditions apply in addition to the Common Policy Conditions and the Commercial Policy Conditions:
>
> * * *
>
> **3. Duties In The Event Of Loss Or Damages**
>
>> **a.** You must see that the following are done in the event of loss or damage to Covered Property:
>>
>> * * *
>>
>> **(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(**Ex. 2,** at 455 Co. LLC 000376-77.)

Landmark never requested that 455 send it a signed, sworn proof of loss, never told 455 the information it sought for any such proof of loss, never made a request for a proof of loss to be responded to within 60 days after its request, and never supplied 455 with "the necessary forms."  As such, Landmark did not invoke "Loss Condition" a. (7), and thus waived the Condition.  Moreover, Landmark did not want a proof of loss from 455

because it, apparently, intended to deny the claim from its inception, regardless of the proofs or other information provided to it by 455.

However, Landmark is shameless when it attempts to argue that, while it did not invoke the Loss Condition regarding submission of a proof of loss or take any of the steps necessary to invoke the obligation to submit a proof of loss, 455 is somehow precluded from recovering penalty interest under MCL 500.2006 because it did not submit an unrequested proof of loss. If Landmark's argument had any merit, then MCL 500.2006 could be negated by any manipulative insurer trying to gain the upper hand on penalty interest by not asking for a proof of loss from its insured and then arguing its policyholder could not recover penalty interest because it intentionally did not request a proof of loss.

Fortunately, whether an insurer requests a formal proof of loss or not, when the policyholder provides, as 455 did in this case, all of the information necessary to constitute a proof of loss, any such requirement has been satisfied. 455 not only substantially complied with the proof of loss requirement by providing the details of the Loss to Landmark, but it complied with every element of a proof of loss as if Landmark had requested a proof of loss from 455 and provided the necessary forms. Landmark was provided with the information on the policy under which the

33

claim was submitted, the coverage grant invoked by the Loss, the details and nature of the Loss, the amount of the Loss, and all of the other details of the Loss including a written statement of the Loss details via the estimates prepared on behalf of both 455 and Landmark by their respective damage experts.  As such, this defense is of neither moment nor materiality under the facts and circumstances of the Loss and the extensive documentation provided to Landmark by 455 as part of its claim.

## CONCLUSION

Each of Landmark's policy defenses will be stripped away at trial, and it is readily apparent that Landmark's wrongful refusal to honor its contractual obligations to 455 is both blatant and taken with the conscious intent to breach the contract.  It is also apparent that, after the Loss, Landmark through its attorneys began a search for reasons not to pay 455's claim.  The deleterious behavior of Landmark left 455 with a building that has not been fully remediated, that has not been returned to its prior condition, that is not rentable to tenants, that is in an impaired condition, and as to which Landmark has breached the Policy.  At the conclusion of the trial, 455 will ask the jury to find that the Loss is within the coverage of the Landmark Policy and to award 455 the damages to which it is entitled in

the amount of $4,684,316.26 for its actual damages, and 12% penalty interest pursuant to MCL 500.2006.

Dated:  April 23, 2018                    MCKOOL SMITH, P.C.

By:  /s/ Burt M. Garson
    Burt M. Garson
    (bgarson@mckoolsmith.com)
    Alexander M. Sugzda
    (asugzda@mckoolsmith.com)
One Bryant Park, 47th Floor
New York, New York 10036
Tel: (212) 402-9400

James D. Wilson
(jwilson@wilsonyoungplc.com)
WILSON YOUNG COSTELLO PLC
Two Towne Square, Suite 901
Southfield, Michigan 48076
Tel: (313) 983-1234

*Attorneys for Plaintiff 455 Companies LLC*

## LOCAL RULE CERTIFICATION

I, Burt M. Garson, certify that this document complies with Local Rule 5.1(a), including:  double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (non-proportional fonts) or 14

point (for proportional fonts).  I also certify that it is the appropriate length.

Local Rule 7.1(d)(3).

By: /s/ Burt M. Garson
    Burt M. Garson
    McKool Smith, P.C.
    One Bryant Park, 47th Floor
    New York, New York 10036

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2018, I caused the foregoing paper to

be electronically filed with the Clerk of the Court using the ECF system

which will send notification of such filing to all counsel of record.


By: /s/ Burt M. Garson
    Burt M. Garson
    McKool Smith, P.C.
    One Bryant Park, 47th Floor
    New York, New York 10036