# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |
|---|---|
| | : HON. ROBERT H. CLELAND |
| 455 COMPANIES LLC, | : |
| | : MAGISTRATE JUDGE STEPHANIE |
| Plaintiff, | : DAWKINS DAVIS |
| v. | : |
| | : Case No.: 16-CV-10034 |
| | : |
| LANDMARK AMERICAN | : |
| INSURANCE COMPANY, | : |
| | : |
| | : |
| Defendant. | : |

JAMES D. WILSON (P41338)
**WILSON YOUNG, PLC**
Attorneys for Plaintiff
2 Towne Square, Suite 901
Southfield, MI 48076
(313) 983-1234
jwilson@wilsonyoungplc.com

MICHELE A. CHAPNICK (P48716)
**GREGORY AND MEYER, P.C.**
Attorneys for Defendant
340 E. Big Beaver Rd., Ste. 520
Troy, MI 48083
(248) 689-3920
mchapnick@gregorylaw.com

BURT M. GARSON
ALEXANDER M. SUGZDA
**MCKOOL SMITH**
Co-Counsel for Plaintiff
One Bryant Park, 47th Floor
New York, NY 10036
(212) 402-9400
bgarson@mckoolsmith.com
asugzda@mckoolsmith.com

COURTNEY E. MURPHY (2683506)
JACOB R. ZISSU (4257275)
ERIC T. KREJCI (3896222)
**CLAUSEN MILLER P.C.**
Attorneys for Defendant
28 Liberty Street, 39th Floor
New York, NY 10005
(212) 805-3900
cmurphy@clausen.com
jzissu@clausen.com
ekrejci@clausen.com

1

### LANDMARK AMERICAN INSURANCE COMPANY'S
### TRIAL BRIEF

NOW COMES Defendant, Landmark American Insurance Company, by and through its attorneys, Clausen Miller, P.C., and submits the following Trial Brief.

## I.    INTRODUCTION

In this breach of contract action, Landmark American Insurance Company ("Landmark") maintains that it has no liability for 455 Companies LLC's ("455") claims for water loss and damage sustained to a commercial property located at 455 Fort Street, Detroit, Michigan, due to 455's breach of the Landmark insurance Policy's Protective Safeguard Endorsements which conditions coverage on the building's heat being maintained at 55 degrees. The heat was not maintained in complete working order at 55 degrees prior to the loss prior to the loss. Pipes in two separate locations within 455's building froze and burst. As such, the condition has not been satisfied, and the exclusion contained in the Protective Safeguard Endorsements applies to preclude 455's claimed loss and damage.

## II.    ISSUES TO BE LITIGATED

The Court is well-versed in the underlying facts giving rise to this action as well as the factual and legal issues resolved by the Court's decision on the parties' respective Motions for Summary Judgments. (Dkt. # 158 and Dkt. #159).

Landmark identifies the following key issues to be litigated[1]:

(1)     Did Plaintiff satisfy the Protective Safeguards Endorsements' condition of coverage which required Plaintiff to maintain heat in complete working order at 55 degrees prior to the loss?

(2)     Even if the condition is determined to have been satisfied – which Landmark disputes - did Plaintiff submit a satisfactory proof of loss such that it is entitled to interest as claimed?

## III.    FACTUAL BACKGROUND

The instant litigation is a first party insurance coverage dispute wherein 455 Companies LLC ("455") contends that Landmark American Insurance Company ("Landmark") breached the terms of its commercial property policy of insurance in failing to pay for water loss and damage sustained by its vacant, five story building located at 455 West Fort Street, Detroit Michigan, a loss allegedly discovered on January 13, 2015.  Landmark denied the claim due to 455' s breach of a warrant contained within the Policy' s Protective Safeguard Endorsements ("PSE") which required it to maintain heat at the premises at or above 55 degrees; if heat was not maintained at 55 degrees, water damage would be an excluded cause of loss. (*See,* R. Doc.  #158; *see also*, R.Doc. 1-1 at 44-46, Protective Safeguards Endorsements; Dkt. 84-8, Pg. ID 5316-532).

---

[1] While Landmark identifies key issues to be litigated, this is not to suggest or imply that they are the only issues to be litigated.  Landmark expressly reserves all rights and defenses available under the Policy and applicable law. Failure to raise any such issues herein should not be construed as a waiver thereof.

3

A.    **The Policy Excludes Water Loss And Damage Where Heat Was Not Maintained At 55 Degrees.**

Landmark issued its Policy to 455 Companies LLC for the term of July 8, 2014 to July 8, 2015.  (Dkt. #158, Pg. ID 11564).  The Landmark Policy afforded all-risk coverage to the described Building located at 455 West Fort Street, Detroit, Michigan with a limit of insurance set at $15,000,000. *Id*.  Importantly, that the Policy provides coverage on an all-risk basis does not mean that it provides coverage for all losses.  *See, e.g., Ariston Airline & Catering Supply Co., Inc. v. Forbes*, 511 A. 2d 1278, 1282 (N.J. Super Ct. Law Div. 1986) (internal citations omitted). The all-risk coverage afforded under the Landmark Policy was subject to all terms, conditions limitations and exclusions contained within such Policy.

Contrary to 455's contentions, read as a whole, the Policy excludes Water loss and damage, but gives back coverage if and only if the terms and conditions of the Protective Safeguards Endorsement and Protective Safeguards - Form Change have been fully complied with.[2]  More specifically, the Policy contains Water exclusions which exclude loss or damage caused by or resulting from Water. (Causes of Loss – Special Form (CP 10 30 06 07)).  The Causes of Loss – Special Form is modified by the Protective Safeguards Endorsement (IL 04 15 04 98) and

_____

[2]   The Protective Safeguards Endorsement and a Protective Safeguards – Form Change which, collectively, changed the Policy form to expressly exclude water loss and damage where the heat was not maintained at 55 degrees.  On both endorsements it reads:  THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY".

4

the Protective Safeguards – Form Change endorsement (RSG 44025 0304) which, collectively, specifically state that Landmark will not pay for water loss or damage, if prior to the loss, 455 knew of any suspension or impairment in any protective safeguard listed in the endorsement's Schedule and failed to notify Landmark of that fact – or – failed to maintain any protection safeguard listed in the endorsement's schedule over which 455 had control or in complete working order. The endorsements' Schedule expressly states: "Heat maintained at 55 degrees". (Dkt. #158).

As this Court has previously held, the Protective Safeguard Endorsements attached to, and made part of, the Landmark Policy added a condition and an exclusion to the Policy. (Dkt. #158). By the express terms of the Policy, Plaintiff warranted, and coverage was conditioned upon, the building's heat being maintained at 55 degrees. "Losses caused by water damage are excluded to the extent that Plaintiff failed to maintain the heat at 55 degrees prior to the loss." (Dkt. #158, Pg. Id. 11573).

### B.    Building Loss Details

455 owns a five story, vacant office building located at 455 West Fort Street in Detroit, Michigan (the "Premises"), having purchased the building and an adjacent parking lot for a total of $3,500,000. (Dkt. #159, Pg. ID 11586). 455 purchased the building in or about June of 2014 when it was vacant. Having no

employees of its own, 455 maintains that it had an oral agreement with a management company (known as "Sterling" or "Comm") to maintain the building for $1,000.00 per month. (Dkt. #84-1, Pg. ID 5255-5256; Dkt. #62, Pg. ID 1276). Simply stated, Comm was asked to keep an eye on the building. (Dkt #83-6, Pg. ID 5238).

455 alleges that on or about January 12, 2015, a pipe broke in the women's restroom on the fifth floor of the premises, causing damage. (Dkt. #1-1, Pg. ID 9). The loss allegedly occurred on January 12, 2015, but was not discovered until January 13, 2015. The date of discovery has neither been established, nor confirmed by any witness. (Dkt. #84-1, Pg. ID 5258: "Again, I was always in doubt whether I got the call on the 12th or the 13th").

Sterling/Comm employee, Michael Bruegger, reportedly learned of the leak on January 13, 2015. (Dkt. #118-4, Pg. ID 8038-8039)  Upon arriving, Mr. Bruegger observed flooding water on all floors of the building, but could not immediately identify the location of the leak. (Bruegger 97:6-9; 98:3-101:17)  Eventually, the leak was found in a burst 1 ½ inch pipe inside a fifth floor bathroom wall ("wet wall").  (Bruegger 103:25-104:10).  As discussed below, plumber Jim Wagner repaired the frozen pipe, noted the building was cold and observed ice on the inside of the windows.

The claim for water damage was first reported to Landmark on January 14, 2015. The Notice of Loss lists January 12, 2015 as the occurrence date – a position in line with the Complaint. (Dkt. #83-4, Pg. ID 5225-5226; *see also*, Dkt. #1-1).

Two days after the incident was reported to Landmark, a second water leak was reportedly discovered on January 16, 2015, by Sterling/Comm employee Matt Pollard. Investigation into the second leak revealed that a 3 inch pipe in the rooftop mechanical room ("Penthouse") had burst and was emanating water. (Dkt. #1-1, Pg. ID 13). As discussed below, engineers Dr. Isaac Sheppard and Dr. Elizabeth Buc were retained as part of Landmark's investigation.

After performing an investigation into the loss under a reservation of rights, Landmark concluded that 455 breached the terms of the Policy's Protective Safeguard Endorsements in failing to maintain the building's heat at 55 degrees, which caused pipes to freeze and burst. (Dkt. #63-11, Pg. ID 1704-1711). Consistent with its conclusion, Landmark denied the claim on May 15, 2015. (Dkt. #65, Pg. ID 2335, 2349 and 2350).

After the denial was issued, 455's counsel requested Landmark to reconsider its denial based upon an expert report first produced on August 5, 2015. Pursuant to and consistent with counsel's request, Landmark agreed to consider 455's request and retained a separate engineering firm Thornton Tomasetti, which was not part of the Company's original investigation. Landmark tasked Thornton Tomasetti to

perform a peer review of the reports furnished by Landmark's engineer and 455's engineer.  (Dkt. #74-4, Pg. ID 3075-3078; Dkt. #65, Pg. ID 2349.)  After a joint inspection was scheduled and concluded, 455's engineer issued a supplemental report which was also considered by Thornton Tomasetti in its review.  Dkt. #65, Pg. ID 2350.   Having reviewed all reports and conducted its own inspection, Thornton Tomasetti concluded that the heat within the building was not maintained at 55 degrees, which caused the pipes to freeze and burst.  Thornton Tomasetti reported its findings to Landmark.  (Dkt. #65, Pg. ID 2350; *see also* Dkt. #83-2, Pg. ID 5193-5216).  Based upon the results of the peer review, Landmark reiterated its declination and provided a complete copy of the Thornton Tomasetti report to 455 on December 10, 2010.  Dkt. #65, Pg. ID 2350; Dkt. #84-11, Pg. ID 5339-5345).  Two days prior to that, 455 commenced suit against Landmark alleging that it had refused to alter its coverage position.  (Dkt. #1-1, Pg. ID 8; Dkt. #82-2).

### C.  Plaintiff Failed To Maintain The Building's Heat at 55 Degrees Prior to the Loss Discovery Date of January 13, 2015

The freezing point of water is 32 degrees Fahrenheit.  The Policy required 455 to maintain the building's heat at 55 degrees, well above freezing.  Building heat is required to avoid the increased hazards associated with lower temperatures such as the bursting of frozen pipes.

455's Managing Partner, Philip Katz, was expressly advised that maintenance of the building's heat at 55 degrees was a condition of coverage.  Mr. Katz was so

8

informed by his own broker during the procurement of the policy.  Mr. Katz testified that he saw the Landmark Quote wherein it said:  "The quote warrants that the heat is to be maintained at 55 degrees – if heat is not maintained…water damage will be an excluded cause of loss."  (Dkt. #65, Pg. ID 2341-2342; *see also*, Dkt. #84-1, Pg. ID 5249.)  Mr. Katz further testified:  "I was informed that such a request for a vacant building is normal. (Dkt. #65, Pg. ID 2341; *see also*, Dkt. #84-1, Pg. ID 5247.)

The loss was allegedly discovered on January 13, 2015.  According to 455's public adjuster, Ethan Gross, the water appeared to have been running for a few days. (Dkt. #83-4, Pg. ID 5228.) After discovery, Solomon Plumbing was called to the location to repair the fifth floor bathroom leak on January 13, 2015.  Upon arrival, Solomon's Jim Wagner arrived on January 13, the building was "really cold" and there was ice on the inside of the windows. (Dkt. #76-7, Pg. ID 3968.)  The Solomon invoices describe Mr. Wagner's work on January 13 as "Repaired frozen 1½ water main on 5th floor." (Dkt. #77-4, Pg. ID 4058.)

Sterling/Comm employee, Matt Pollard, also observed the water leak discovered on January 16, 2015.  He described it as "There was water dripping out of a frozen pipe. … It was melting ice." (Dkt. #84-9, Pg. ID 5329.)  Matthew Pollard further testified that he first became aware there was no heat in the building based

---

[1] There appears a typographical error in the transcription which reads "cost of loss" as opposed to "cause of loss" which appears in the quote itself. (Katz Dep. Ex. 6.)

9

upon the frozen pipes. (Dkt. #84-9, Pg. ID 5330-5331; *see also* Dkt. #82-4, Pg. ID 5180-5181.) Solomon Plumbing was again called to the location, this time, to repair the second lead located in the Penthouse. When Solomon's Don Archer arrived on January 16th, there was ice on the door and there was ice on the area where the water was spraying out. (Dkt. #76-8, Pg. ID 3974.) The Solomon invoices describe Mr. Archer's work as "Capped off frozen 3" galv water line." (Dkt. #77-5, Pg. ID 4060.)

After notice of the loss was received, Landmark retained Isaac Sheppard, PhD, a structural engineer, to examine the glass curtain wall of the building to determine if the ice on the inside of the building had caused any structural damage. (Dkt. #77-2, Pg. ID 4036.) On January 16, 2015, Dr. Sheppard inspected the glass curtain wall with Caleb Williams, an employee of the restoration company, Signal, hired by 455 to attend to the water damage. Dr. Sheppard observed the building was cool and there was a half an inch to an inch of ice on the inside of the windows. (Dkt. #77-2, Pg. ID 4038-4039.) He testified: "I saw that. Eyewitness, I saw that ice." (Sheppard 68:6-15.) Moreover, Dr. Sheppard described the ice as "[I]t's not like water was flowing down the ice. It's not like the ice was melting and had a – a bright sheen to it. As I remember, the ice still looked like ice cubes from an ice cube tray, not like they were melting." (Sheppard: 69:11-17.)

Landmark also retained Dr. Elizabeth Buc, PhD to assist in the investigation on or about January 21, 2015. (Dkt. #63-11, Pg. ID 1704-1711.) Dr. Buc inspected

10

the premises multiple times, beginning on January 26, 2015. As her investigation would reveal, there were multiple broken pipes and fittings in the vicinity the 5th Floor and Penthouse leaks, indicating that the property had been subjected to freeze losses both in 2015 and possibly earlier. *Id.* Accordingly, Dr. Buc took custody of the pipe remnant which had leaked on the 5th floor and also took a sample of the pipe which had been capped in place in the Penthouse, among others. (Dkt. #77-9, Pg. ID 4103.)

Dr. Buc's investigation determined that there was a pipe freeze due to a failure to maintain heat at the building. Following a joint inspection of the parties in March of 2015, she issued her findings in an April 8, 2015 report, which provides, in pertinent part, as follows:

- The various breaks and failures in the fifth floor wet wall, boiler room and under the kitchen sink and in the penthouse were consistent with exposure to freezing temperatures and elevated pressures resulting from exposure to freezing temperatures;

- The breaks and failures themselves were characteristic of freezing and multiple burst locations are typical of freezing related failures;

- The steam utility records confirmed steam usage was provided to the fifth and lower floors; however, the damage to the penthouse piping and fittings are not consistent with an environment maintained at 55 degrees Fahrenheit; and

- The associated elevated pressures in the penthouse piping caused the fifth floor wet wall pipe burst and sink shut off valve separation.

11

(Dkt. #63-11, Pg. ID 1704-1711.)

Following Landmark's denial of the claim, in June of 2015, David Eby was retained by 455 to examine the cause and origin of the loss. However, instead of determining the cause and origin of the loss, Eby instead created a list of possible causes for pipe bursts, conveniently eliminating freezing as a cause of loss. (Dkt. #64-16, Pg. ID 2210-2234.)

David Eby conducted inspections in June 2015 during which he utilized thermal imaging to show heat flows in the building – in the **summer** of 2015. *Id.* at ID 2225. In June of 2015 Eby found that a radiant heater in the penthouse and "heat trace" electrical tape wrapped around the split pipe were able to produce some heat in the Penthouse – a structure open to outside air due to its louver wall. *Id.*

Significantly, at the time of David Eby's July 31, 2015 report, Eby had never inspected the 5th floor or other pipe remnants which had been collected by Dr. Buc. Thus, without seeing the actual pipe evidence in this case, David Eby opined that freezing could not have caused the pipes at issue to burst. Nevertheless, Dr. Eby theorized that other causes may have existed, including:

- Water hammer pressure spikes;
- City water pressure spikes;
- Faulty water expansion tanks;
- Corrosion; and/or
- A faulty water booster pump causing pressure spikes.

(Dkt. #64-16, Pg. ID 2232-2234).

Dr. Eby's July 31, 2015 report was provided to Landmark via an August 5, 2015 letter from attorney Garson which requested Landmark to reconsider its denial. Based upon the language used to describe Dr. Buc's opinion in attorney Garson's correspondence, Landmark hired, D. Michael Dowdall, to performed a peer review of both reports and issue an opinion as to both as well as opine on the cause and origin of the loss.  (Dkt. #74-4, Pg. ID 3075-3078; Dkt. # 65, Pg. ID 2349.)

Consistent with his instruction, D. Michael Dowdall reviewed the reports of Dr. Buc and David Eby – including a supplemental report issued by David Eby on November 11, 2015.  (Dkt. #64-17, Pg. ID 2236-2245.)  Mr. Dowdall inspected the evidence in Dr. Buc's custody.   He also inspected the building for himself, accompanied by David Eby.

Upon review if the reports, Mr. Dowdall opined that the loss was caused by a failure to maintain heat above freezing, in pertinent part, as follows:

- The 3" penthouse pipe failed due to pressure from expanding ice and the 1-1/2"copper pipe on the 5th floor also failed due to expanding ice; neither pipe failed due to internal hydrostatic pressure;

- Although steam heat was being provided to the building, this does not prove it was adequate to prevent the pipes from freezing; the 5th floor wet wall has multiple penetrations which allow cold outside air to infiltrate the area, and the Penthouse was inadequately insulated and/or heated; and

- It is likely the multiple breaks aside from the 5th floor wet wall 1-1/2"pipe and Penthouse 3" pipe occurred previously; the hot water system breaks are not material to this loss.
- 

(Dkt. #74-4, Pg. ID 3075-3078; Dkt. #65, Pg. ID 2349.)

Mr. Dowdall's report expressed the following subtle technical distinction with regards to the language used by Dr. Buc in her opinion:

- does not agree that, "The freezing conditions in the penthouse resulted in increased pressures in the associated water pipes causing the fifth floor failures."

- does not agree with the conclusions reached with respect to the hydrostatic pressure – i.e., does not agree that "The associated elevated pressures in the penthouse piping caused the fifth floor wet wall pipe burst and sink shut off valve separation."

*Id.*

Both Dr. Buc and Mr. Dowdall agreed that the 3 inch pipe in the Penthouse burst due to pressure caused by freezing, and that the 1½ inch pipe on the 5th floor burst due to the pressure caused by freezing. Both pipes exhibited characteristics of bulging deformation. Both Dr. Buc and Mr. Dowdall concluded that the bulging deformation around the area of the pipe splits could only have been caused by the expansion of water becoming ice.

Dr. Buc used the phrase hydrostatic pressure to describe this phenomenon, while Mr. Dowdall believes that this is a function of direct pressure exerted by the ice, testifying, "… it's really a minor and inconsequential difference. It's just a difference in terms, in terminology, but it was still -- exceeded the yield of the

14

ultimate strength of the material and it failed. It was a freeze loss." (Dkt. #76-5, Pg. ID 3939).

Thus, both Dr. Buc and Mr. Dowdall have opined that the pipe bursts themselves establish that heat was not maintained at 55 degrees.

Not disclosed to Dr. Buc and Mr. Dowdall at the time of their initial reporting, was Mr. Bruegger's knowledge of D.J. McConnell "no heat" service call and removal of the float bulb from the steam system's condensate trap. The McConnell invoice was found for the first time at the very last page of 455's June 9, 2016 production in discovery.

David McConnell was called to the location to diagnose why there was no heat at the building. Mr. McConnell's handwritten notes indicate that this service call was performed on January 13, 2015. Dkt. #84-4, Pg. ID 5279-80. His printed invoice issued after the service was performed lists January 14, 2015. Mr. McConnell could not recall which day it was in his testimony. Notably, when Mr. McConnell arrived, he felt there was no heat - the steam system pipes were cool to the touch. (Dkt. #76-6, Pg. ID 3961; Dkt. #76-6, Pg. ID 3963). He opened up the steam trap and discovered a float bulb full of water. (Dkt. #76-6, Pg. ID 3964). The significance of this float bulb being full of water is explained by Mr. McConnell as follows:

15

Q.      And I've also heard some people refer to a steam trap almost like a toilet bowl comparison. Can you explain how this steam trap at this building worked?

A.      Well, once again, this steam trap has a float ball in it, not unlike a toilet. And when that steam trap housing gets enough water in it, that float will lift up and open an internal valve to allow that condensate to be pushed back towards the steam meter. So when there's no water in the trap, the float drops down and closes off that valve. So the idea is to keep the steam that you've purchased inside the vessel so it can do its job. So we extract the heat out of it.

Q.      And so when the valve is closed, there's no steam heat coming into the trap?

A.      Correct.

Q.      And if there's no steam heat coming into the trap, there's no steam going into -- into the heat exchanger?

A.      Correct. It stops the flow.

***

(McConnell 46:23-47:15)

Q.      And so just backtracking through our discussion of how the steam works in this building and how the heat from that steam is transferred to a heat exchanger, which then goes through a closed loop system, through circulating pumps up to the floor, through air handlers to the interior of the premises, I just want to make clear that the hot steam from Detroit Thermal does not actually rise through the building to heat it; is that correct?

A.      Not –

MR. SUGZDA: Object to the form.

THE WITNESS: Not that I'm aware of.

(McConnell 50:21-51:7)

***

Q.      But you were able to quickly diagnose that there was heat coming in from the district from the street and no heat going –

A.      Yes.

Q.      -- into the building?

A.      Yes.

16

(McConnell 51:14-19)

The float bulb had a pinhole leak which had allowed it to fill with water over time. (Dowdall 172:24-173:11)  Thus, based upon Mr. McConnell's discovery of a float bulb full of water, the steam system could not have provided heat to the building for a significant time prior to Mr. McConnell's service call diagnosing the "no heat" cause.

Comm Group's Mr. Pollard testified that the problems with the float ball, combined with the frozen pipe in the penthouse, led him to believe that the heat was not on at the time of the loss. (Dkt. # 84-9, Pg. ID 5329-31; Dkt. # 158 Pg. ID 11570)

In May of 2016, Mr. Bruegger produced for the first time photographs purporting to show the gauges of the steam system on January 13, 2015.  These four (4) photographs are the only four (4) photographs of the building taken by Mr. Bruegger.  The photographs which were produced on May 17, 2016 had been altered in that their size and metadata was modified.  Mr. Bruegger was asked about the origin of these photos during his September 19, 2016 deposition, whereupon he testified that the photos were taken on his phone and that the phone could not be examined because, "The phone is gone." (Dkt. #76-3, Pg. ID 3882).

Mr. Brugger's photographs of the system's thermometer and pressure gauges, at best, does still not demonstrate that all zones were functional and capable of heat

distribution.

Both 455 and its engineer rely exclusively on the uncorroborated testimony of Comm Group's Mike Brugger as the sole source for the proposition that the building's heat was on when the loss was discovered. Given Mr. Bruegger's responsibility to maintain the building at 55 degrees; his failure to disclose the "no heat" call (Dkt. #76-3, Pg. ID 3877); his failure to inform Dr. Buc of the "no heat" call during the Company's interview; his removal of the float bulb from the building and storage of it in his office (Dkt. #76-3, Pg. ID 3875-3876); and, with the likelihood that additional suit(s) will be filed in the future against his employer, Mr. Bruegger – as a party interested in the outcome of this litigation - has every motive and bias which would render any evidence based upon his testimony unreliable.

Despite the overwhelming evidence that the pipes at issue froze, David Eby has chosen to credit Mr. Bruegger's purported evidence in order to reach a conclusion that the building was at 55 degrees prior to the loss. Indeed, Dr. Eby simply parrots the testimony of Michael Brugger regarding conditions Brugger alleges to have observed at an undetermined time after the occurrence of the ruptures:

> Q. Other than Mr. Brugger's testimony, what evidence do you have that the perimeter heating was warm on January 13 of 2015?
> A. What date did you say again?
>
> Q. January 13, of 2015.
> A. That's the evidence that's there.

18

Q. Thank you.  That's the only evidence; correct?
A. That I can think of at the moment, yes.

(Dkt. #64, Pg. ID 2018.)

Relying heavily on Mr. Bruegger's testimony, Dr. Eby concluded that the building's heat was maintained at 55 degrees and that the loss was not due to freezing – a conclusion reached despite the presence of thick ice throughout the building's interior and despite independent confirmation that the pipes in the 5th floor ladies and the penthouse, had frozen.

## III.    ARGUMENT

### A.    Plaintiff's Burden to Prove Satisfaction of the Condition Precedent

Plaintiff has the initial burden to prove that a fortuitous loss occurred to insured property, that the insured loss occurred within the policy period and, that the value of the damages claimed resulted from insured loss to insured property. Plaintiff also has the burden to prove it complied with the Policy's condition to maintain the building's heat at 55 degrees as required by the Protective Safeguard Endorsements.

For coverage to exist, Plaintiff must comply with all terms and conditions of the Landmark Policy (No. LHD3888687).  Where Plaintiff fails to satisfy a condition precedent in the contract of insurance, Plaintiff is not entitled to the benefits of the contract.  *See*, *Nykoriak v. Diamond State Insurance Company* 2015

WL 12684462; *Bruinsma v. State Farm Fire & Casualty Co.*, 410 F. Supp. 2d 628, 633 (W.D. Mich. 2006); *Decker Mftg. Corp. v. Travelers Indem. Co.*, No. 1:13-CV-820, 2015 U.S. Dist. LEXIS 12169, at *28 (W.D. Mich. Feb. 3, 2015). *Valley Nat'l Bank of Arizona v Kline*, 108 Mich. App. 133, 137-38; 310 N.W.2d 301 (1981).

To the extent Plaintiff meets its preliminary burden to demonstrate that it satisfied the condition in the Policy's PSEs, only then does the burden shift to Landmark to prove any exclusions applicable for those actual items of loss or damage that Plaintiff has initially proven.

Plaintiff cannot demonstrate that it satisfied the condition precedent for coverage due to the deficiency in proof in, and inability to advance any evidence that the building's heat was maintained at or greater than 55 degrees in the days prior to the discovery of the loss.

### B.  The Policy's condition for coverage was not satisfied and the PSEs' exclusion precludes coverage for water loss and damage.

Even if Plaintiff is excused of its preliminary burden to demonstrate compliance with the Policy's condition to maintain the building's heat at 55 degrees, here, the evidence is clear that the building's heat was not maintained at 55 degrees and the exclusion applies and bars coverage for Plaintiff's water loss and damage.  In failing to maintain the building's heat at 55 degrees, Plaintiff failed to comply with the Policy's Protective Safeguard Endorsements.  As such,

Plaintiff's claims for water loss and damage to its vacant building are excluded by the express terms of the Policy's Protective Safeguard Endorsements and Landmark has no liability under its Policy for the claimed loss.

As this Court has ruled, the PSE modified the Policy's Water exclusion to expressly condition coverage for water loss and damage on the building's heat being maintained at 55 degrees. No exceptions are provided for by the PSE. The Protective Safeguard Endorsements mandate and condition coverage on the heat being unequivocally maintained at 55 degrees and if not maintained as such, then there simply is no coverage.

Contrary to 455's contentions, Landmark need not prove that the failure to maintain heat at 55 degrees caused the pipes to freeze which in turn caused the pipes to rupture. The express terms of the Policy contain no such requirement. *See, Nat'l Fire & Marine Ins. Co. v. 3327 W. 47th Place, LLC*, 2017 U.S. Dist. LEXIS 189912, *16-17, 2017 WL 5499154 where court held an insurer does not need to show a causal connection between the breach of a condition precedent and the subsequent loss; *see also*, *Wabash Properties, Inc. v. Transp. Indem. Co.*, No. 84 C 7641, 1985 WL 2452, at *3-4 (N.D. Ill. Aug. 21, 1985). In *Wabash*, the insured argued that the insurer could not avoid coverage unless it proved that the failure of the insured's sprinkler system, which the insured was required to maintain as a condition of the insurance policy, caused the destruction of the building. The court explained that

an insurer "need not show a causal connection between the breach of the condition and the loss." *Id.* (citing *Mack v. Liverpool and London and Globe Insurance Co.*, 329 Ill. 158, 160 N.E. 222 (1928)).  Put differently, "[i]f an insured breaches a condition of the  policy, 'it is immaterial that the breach was in no manner whatsoever connected with, or that it did not at all occasion, the loss, for the warranty is a condition on which the validity of the contract rests, which failing, the contract fails.'" *Id.* At *4.  Accordingly, the court found that since the insured had breached the sprinkler requirement in its policy, "coverage under the policy was suspended during the breach whether or not the failure of the sprinkler caused the loss." *Id.*; *see also Chi. Title & Trust Co. v. Ill. Fair Plan Ass'n*, 90 Ill. App. 3d 1061, 414 N.E. 2d 205, 46 Ill. Dec. 483 (1980) (holding insurer did not have to prove building's vacancy caused fire damage to enforce provision voiding coverage during periods when building was vacant).

Landmark's investigation revealed that not one, but two (2) pipes and a valve froze and cracked – a determination also made by contractors called to the building to perform requisite repairs.  Landmark's investigation also revealed that substantial ice had formed on the inside of the building – directly above the heat registers – a condition which negates any claim that the building's heat was maintained at 55 degrees.

No one knows when the loss first occurred, how long the water was permitted to leak or – amazingly - who first discovered the loss. (Dkt. #64-2, Pg. ID 2046-2048.) No evidence exists to show that the property was walked or inspected in the days before the loss was discovered. According to 455's Public Adjuster, based upon the volume of water, it had been leaking for days before it was eventually discovered. (Dkt. #83-4, Pg. ID 5228.) By all accounts, ice lined the interior windows of the subject Commercial building with varying thickness from half an inch to an inch thick on the loss discovery date. (Dkt. #77-2, Pg. ID 4038; Dkt. #77-2, Pg. ID 4039.) Contractors summoned to the building by 455 to repair the 5th floor burst pipes on January 13th reported that the building was "really cold". (Dkt. #76-7, Pg. ID 3968; Dkt. #77-4, Pg. ID 4058.) Repair invoices for the pipe described the work as: "Repaired *frozen* 1½ water main on 5th floor." *Id. Emphasis added*. Additional leaking was discovered in the Penthouse three days after the 5th floor discovery by Sterling/Comm employee, Matthew Pollard, on or about January 16, 2015. (Dkt. #1-1 at 8; Dkt. #76-4, Pg. ID 3889-3891.) Mr. Pollard described the discovery of the leak as, "There was water dripping out of a *frozen* pipe. … It was melting ice." (Dkt. #76-4, Pg. ID 3891.) (Emphasis added.) Between the interior ice and various pipes described as "frozen" – even independent of Landmark's expert reports - such conditions are inconsistent with an ambient temperature of 55 degrees.

Although Dr. Eby summarily concluded that the building's heat was maintained at 55 degrees, he also testified that he lacked key facts, and further, that there was not enough work done to study or determine facts which he himself believed were necessary to establish the cause of loss:

- Eby does not know when the pipes or valve burst and Eby does not know how long the water had been running before its discovery.;
- Eby does not know when the last time anyone had been in the building prior to the discovery of the ruptures;
- Eby does not know who discovered the water loss or who may have been present prior to Brugger's arrival;
- Eby was unable to determine whether the two pipes that burst are part of the same water line, "You just can't tell.";
- "… there was not really enough work done to study the fractures …"
- "There was not enough work done to even determine what the water pressure was after the time of loss was discovered."
- "There was just not enough work done to really rule things out."

(Dkt. #64, Pg. ID 2015-2016.)

D.J. McConnell, on the other hand, was able to quickly diagnose that there was heat coming in from the district from the street and no heat going into the building. (Dkt. #76-6, Pg. ID 3963.)   D.J. McConnell's testified that the float bulb was "full" of water and rendered the steam system inoperable. (Dkt. #76-6, Pg. ID 3958; Dkt. #76-6, Pg. ID 3961-3964.)

455's reliance on the utility records from Detroit Thermal to demonstrate that the building was adequately heated at the time of the Loss is misplaced and purposefully confuses the basic concepts of supply versus distribution. Such

records do not demonstrate that the heating system was operational such that heat was being dispensed throughout the building and maintained at 55 degrees as required by the PSE. (Dkt. #63-15, Pg. ID 1765.) The testimony and photographs relied upon by 455 to establish the heat at the time of the loss are provided by a management company which faces its own direct liability if found that their failure or oversight caused 455 to breach the PSE. (S*ee also, United States v. Wilkins* (No. 15-00232-01-CR-W-HFS, 2016 U.S. Dist. LEXIS 59808, at *11-14 (W.D. Mo. 2016).

Given the totality of the affirmative and independent evidence that the building's heat was not maintained at 55 degrees – a fact confirmed by Landmark's experts - Plaintiff will not be able to prove that it complied with the condition contained within the Protective Safeguards Endorsements. Further, the evidence affirmatively and dispositively demonstrates the applicability of the Protective Safeguard Endorsements' exclusion which precludes coverage for 455's water loss and damage.

### C.    No violation of Michigan Compiled Law Laws § 500.2006 exists and no interest is owed where 455 admittedly failed to provide Landmark with a satisfactory Proof of Loss

455 seeks interested for Landmark's alleged violation of Michigan Compiled Laws § 500.2006. According to 455, the elements of a claim for violation of the statute are that (1) benefits are not paid on a timely basis under an insurance

policy, and (2) that the insurer has received satisfactory proof of loss from the policyholder. If those two conditions are met, the policyholder is entitled to payment of 12% penalty interest on the amount of the claim. In support of its contention, 455 cites to: Mich. Comp. Laws § 500.2006; *Nickola v. MIC Gen. Ins. Co.*, 500 Mich. 115, 894 N.W.2d 552, 555–61 (2017); *Griswold Props., L.L.C. v. Lexington Ins. Co.*, 276 Mich. App. 551, 564–66, 741 N.W.2d 549, 556–57 (2007).

At no time during the pendency of Landmark's investigation, or after the Company issued its denial letter, or at any time prior to Plaintiff's commencement of this action, did Plaintiff submit a claim demanding payment or a proof of loss for Landmark's consideration, much less a satisfactory proof of loss as is required by Mich. Comp. Laws § 500.2006 for the entitlement of interest.

455's Public Adjuster, Ethan Gross, testified as follows:

Q   Okay. At any time prior to the denial of May 13th, 2015, had you on behalf of the insured submitted any type of sworn proof of loss to the insurance company for its consideration? And what I mean sworn, I mean actually sworn before a notary public.
A   We did not file a sworn statement in proof of loss.

(Gross: 344:23 – 345:8).

455 retained the services of a Public Adjuster the day the loss was discovered. Since January 14, 2015, and thereafter 455 was represented by Ethan Gross of Globe Midwest Corporation. Mr. Gross is a licensed Public Adjuster and an attorney admitted in Michigan. Along with Globe, building contractor Stonier

Consulting was also retained immediately after the loss was discovered.   Despite this dual representation, at no time prior to the commencement of this action had 455 ever submitted any Xactimates or other property damages estimates for Landmark's consideration.  455 and its representatives were aware of the information that was necessary for a satisfactory proof of loss, but failed to produce any estimates of its claimed loss and damage to Landmark prior to filing this lawsuit.   Indeed, 455's first production of its damages estimate was contained within its discovery responses.  Having provided nothing to Landmark, it cannot be said that 455 submitted proofs of loss - satisfactory or otherwise – sufficient to award interest under the statute.

Although certain, partial Signal invoices were produced to Landmark for its consideration, such invoices admittedly contained excluded or otherwise sublimited damages for asbestos and mold and were otherwise inflated due to 455's failure to keep a handle on the services being performed on their behalf. (Dkt. 159 Pg. Id.  11583).

Further, 455 seeks interest on the replacement cost value when they admittedly failed to repair or replace the subject property.  Landmark's Policy expressly provides that Plaintiff must actually repair or replace the damaged property in order to recover replacement cost proceeds.  This is consistent with MCL 500.2826 and applicable case law. *See* e.g., *Cortez v. Fire Ins. Exchange*,

27

493 N.W.2d 505, 196 Mich. App. 666 (1992); *Smith v. Michigan Basic Property Ins. Ass'n*, 441 Mich. 181, 189 (1992).  We are cognizant of the Court's Opinion and Order of August 9, 2017 (R.Doc. 159), however, in the event that the Jury finds coverage, but does not find that Landmark was responsible for disabling 455 from undertaking the repair or replacement – based upon 455's lack of any repair whatsoever – then 455 must effectuate repair or replacement in order to receive Replacement Cost value.  And, 455 would not presently be entitled to interest on the replacement cost value.

Plaintiff should not be relieved of the requirement to set forth their claim as is required by the Policy's Duties in the Event of Loss provision, much less rewarded for their failure, by awarding interest pursuant to Michigan Compiled Laws § 500.2006 where they admittedly failed to submit a claim, much less a satisfactory proof of loss as is required by the statute as a condition precedent if interest is to be imposed.  (Dkt. #62-1, Pg. ID 1334).  Like everything else in this matter, because the condition precedent to Michigan Compiled Laws § 500.2006 has not been satisfied, 455's demand for interest on its damages must be denied and dismissed as a matter of law.

April 23, 2018

/s/ Courtney E. Murphy
Clausen Miller, P.C.
Attorneys for Defendant
28 Liberty Street, 39th Floor

(212) 805 3908
Dated April 23, 2018
cmurphy@clausen.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2018, I electronically filed the foregoing paper v
the Clerk of the Court using the ECF system which will send notification of such
filing to the following **James Wilson, Burt Garson, and Alexander Sugzda**.

s/ Courtney E. Murphy
**CLAUSEN MILLER P.C.** Attorneys for Defendant

28 Liberty Street, 39th Fl.
New York, NY 10005
(212) 805-3900
Dated: April 23, 2018
cmurphy@clausen.com